# Exhibit A

```
 1    STATE OF MINNESOTA                        DISTRICT COURT

 2    COUNTY OF RAMSEY                  SECOND JUDICIAL DISTRICT

 3    -----------------------------------------------------------

 4    STATE OF MINNESOTA,

 5                 Plaintiff,

 6       vs.                         TRANSCRIPT OF PROCEEDINGS

 7    BROCK WILLIAM FREDIN,

 8                 Defendant.

 9    -----------------------------------------------------------

10              DISTRICT COURT FILE:  62-CR-17-3156

11    -----------------------------------------------------------

12       The above-entitled matter came on for hearing before

13    the HONORABLE SOPHIA Y. VUELO, Judge of Ramsey County

14    District Court, on October 17, 2018, in the Ramsey County

15    Court House, St. Paul, Minnesota.

16                   *           *           *

17                        APPEARANCES

18       STEPHEN CHRISTIE, OFFICE OF THE SAINT PAUL CITY

19    ATTORNEY, 500 City Hall and Court House, 15 W. Kellogg

20    Boulevard, St. Paul, Minnesota 55102, appeared representing

21    the Plaintiff.

22       BRUCE WENGER, OFFICE OF THE RAMSEY COUNTY PUBLIC

23    DEFENDER, 101 East Fifth Street, Suite 1808, St. Paul,

24    Minnesota 55101, appeared representing the Defendant.

25       (Whereupon, the following proceedings were duly had.)
```

                                                          -1-

CASE 0:19-cv-00472-DWF-TNL   Document 34-1   Filed 10/29/19   Page 3 of 78   Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

62-CR-17-3156

1        THE CLERK:  Calling page two, line five,

2   Brock Fredin.

3        THE COURT:  Appearances, please.

4        MR. CHRISTIE:  Good morning, Your Honor.

5   Steve Christie, of the City of St. Paul, on behalf of

6   the State of Minnesota.

7        MR. BARKMAN:  Michael Barkman, with

8   Probation.

9        MR. WENGER:  Bruce Wenger, W-E-N-G-E-R,

10  present in court with my client, Mr. Brock Fredin --

11       DEFENDANT FREDIN:  Correct.

12       MR. WENGER:  -- out of custody, standing to

13  my left.  So the record is clear, I was not the

14  attorney of record in the trial and have been appointed

15  only for the sentencing.

16       THE COURT:  That is correct.  Mr. Wenger was

17  not the attorney of record for the jury trial phase.

18  Mr. Wenger was appointed weeks ago to assist and

19  represent Mr. Fredin with the sentencing in Court File

20  62-CR-17-3156.

21       The record should also reflect this sentencing

22  date was originally scheduled to occur back in, I want

23  to say, September.  However, that hearing was

24  rescheduled upon Mr. Fredin claiming he was indigent

25  and needed the assistance of a public defender to be

                                                    -2-

62-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   appointed to represent him.  For that reason, the Court

2   paused in this case and referred Mr. Fredin back to our

3   arraignment calendar to be screened and considered for

4   a public defender.  Judge Grewing appointed the public

5   defender's office to assist Mr. Fredin in this matter.

6   And so this sentencing date was continued from its

7   original date to give Mr. Fredin and his new attorney,

8   Mr. Wenger, the benefit of working together in

9   preparing for today's hearing.

10         The Court, in preparation for today's sentencing,

11   has received the presentence investigation report that

12   I ordered in this case.  I have read that, along with

13   the memorandum of law provided by Mr. Steve Christie on

14   behalf of the City of St. Paul.  I have also reviewed

15   all of the attached documents provided by the State.

16   This Court has also reviewed the voluminous amount of

17   paperwork filed on his own behalf, Mr. Brock Fredin,

18   filed on this case, both at the District Court level

19   and the Court of Appeals level.

20         Are there any changes, corrections, or amendments

21   to the presentence investigation report, from either

22   Mr. Christie or Mr. Wenger?

23         MR. CHRISTIE:  Your Honor, Probation only

24   accounts for four days of jail credit.  I believe the

25   defendant's entitled to a fifth day of jail credit.

—3—

RAMSEY COUNTY DISTRICT COURT

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    You'll recall that on the morning of September 17,

2    2018, you held the defendant in direct contempt.  He

3    was remanded into custody of the deputies for

4    approximately two hours, and he's entitled to credit

5    for that situation.  I suspect that Probation did not

6    find that in the record because the defendant was not

7    formally booked for that remand.

8            THE COURT:  In the spirit of transparency, it

9    would be this Court's intent to give him credit for the

10   two hours he spent in our custody.

11           MR. WENGER:  Thank you, Your Honor.

12           MR. CHRISTIE:  I have no other additions or

13   corrections.

14           THE COURT:  Mr. Wenger, are there any

15   changes, corrections, or amendments on your part?

16           MR. WENGER:  None, Your Honor.

17           THE COURT:  I will first hear from the State

18   and Probation, if they wish to offer any additional

19   information, and then from Mr. Wenger and then Mr.

20   Fredin.  And I'm also informed -- have been informed

21   that the victim herself would like to read a statement.

22      Mr. Christie.

23           MR. CHRISTIE:  So, Your Honor, as is a right

24   under the statute, Ms. Grace Miller, the victim in this

25   case, wishes to read a statement -- a victim impact

52-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1  statement. I'd ask that she do so at this time, before

2  I add any remarks.

3  THE COURT: Before we do so, Mr. Fredin, I

4  have to ask you in open court -- Mr. Fredin -- Mr.

5  Brock Fredin?

6  DEFENDANT FREDIN: Sorry.

7  THE COURT: I'm going to ask you in open

8  court, do you have any recording device on you?

9  DEFENDANT FREDIN: No, ma'am.

10  THE COURT: Because if you do, you know what

11  this Court's expectation is, right? That it be turned

12  over to me and placed on the bench. So you're telling

13  me you have no such recording device on you?

14  DEFENDANT FREDIN: Correct, ma'am.

15  THE COURT: All right. I'm going to ask that

16  Mr. Fredin step aside, as far to the window as you can.

17  I'm also going to instruct that while Ms. Miller reads

18  her statement, Mr. Fredin not stare at her. I'm not

19  making any inference at this time that you have done

20  that during this proceeding. I'm trying to take

21  precaution and don't want any misinterpretation that

22  Mr. Fredin may be expressing any facial gestures of any

23  kind to Ms. Miller while she reads her statement.

24  Are we clear on that, Mr. Fredin?

25  DEFENDANT FREDIN: Yes, ma'am.

—5—

RAMSEY COUNTY DISTRICT COURT

92-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1          THE COURT:  Mr. Christie.

2          MR. CHRISTIE:  Ms. Miller.

3          THE COURT:  Ms. Miller, for the record,

4    please state your first and last name.

5          MS. MILLER:  Grace Miller, Your Honor.

6          THE COURT:  That's M-I-L-L-E-R, correct?

7          MS. MILLER:  Yes, Your Honor.

8          THE COURT:  You may read your statement.

9          MS. MILLER:  Good morning, Your Honor.  Thank

10   you for giving me the opportunity to speak.  As I

11   mentioned in court, I'm a major in the Air Force

12   Reserve, a veteran of 12 years.  I'm also a doctoral

13   student, preparing to defend my dissertation next week.

14   Here's what I'm not:  I'm not abusive.  I'm not a

15   stalker or a bully.  I'm not an alcoholic.  I do not

16   have PTSD.  I am not the commander of a military base,

17   and I'm not a drone pilot nor have I ever worked in a

18   Department of Defense assassination drone program.  I'm

19   not a lesbian.  I'm not a powerful public figure.  I

20   did not domestically abuse or threaten to kill Brock

21   Fredin.  I never murdered children in Iraq.  I am not

22   and have never been on welfare.  I am not psychotic.  I

23   am not an unethical and intemperate military officer.

24         THE COURT:  Mr. Christie, we have tissue

25   behind you.

—6—

RAMSEY COUNTY DISTRICT COURT

1          MS. MILLER:  I'm fine.  I'm fine.  And, above

2     all, I'm not a liar.  But these are all things Brock

3     Fredin has said about me on social media, on smear

4     pages he's authored, and in bogus legal motions and

5     lawsuits he's filed against me since I received my

6     restraining order.  The past two and a half years have

7     been a nightmare, and the conviction didn't put a stop

8     to Brock's abusive and obsessive behavior.

9          Can I sit down?

10          THE COURT:  You may.

11          MS. MILLER:  I'm sorry.

12          THE COURT:  Of course.

13          MS. MILLER:  At the trial, the Court examined

14     a time frame ending on 10 February, 2016, when I

15     contacted the police about a restraining order

16     violation, but Brock has been attacking me and trying

17     to ruin my life ever since.  In March 2016, Mr. Fredin

18     filed a retaliatory order for protection petition about

19     me and then a harassment restraining order when that

20     failed, claiming, among other things, that I murdered

21     children in Iraq by running them over with my truck,

22     that I'm a violent alcoholic, and that he was the one

23     who broke up with me and that I threatened to kill him.

24     Of course, none of this is true.  The remedy Brock

25     requested was for me to be forced into three types of

—7—

1   counseling -- anger management, domestic abuse, and

2   chemical dependency, for the Court to confiscate my gun

3   and for me to pay him exactly $2,201 for his trouble.

4        I was served a copy of this petition by the

5   sheriff.  That was a nightmarish day because that's

6   when I first realized that Mr. Fredin wasn't just a

7   lovesick, obsessive ex.  He was an obsessive ex who

8   wanted revenge, and he was willing to lie and

9   manipulate the court system to do it, all because he

10  didn't get what he wanted because I said no.

11       A few months later, in June 2016, Brock made a

12  smear page about me on a website called Dating Psychos.

13  I was alerted to this by another one of his victims who

14  found a similar page about herself, my friend,

15  Catherine Schaefer, another one of his victims who has

16  now become a dear friend.  My page included my full

17  name, age, city, military branch, rank, career field,

18  and Ph.D. program.  An early iteration of the site even

19  included my personal e-mail address so readers could

20  contact me if they saw fit.  At the top of the page was

21  a gold star that labeled me a certified piece of

22  expletive.  The site described me as a, quote, total

23  bully, stalker, harassment, threatened to kill me, and

24  complete narcissist, has mild PTSD from military

25  deployments and constantly overreacts, intimidates, and

—8—

1   bullies others.  I was applying for a new job at the

2   time, so I had to inform the hiring official that I had

3   a stalker who had been smearing me on the Internet.

4   Fortunately, I still got the job, despite Brock's best

5   efforts.  A month later, I deployed to the Middle East,

6   and I spent my last night in the U.S. sending messages

7   to Dating Psychos, asking them to remove the page so I

8   would have one less thing to worry about overseas.

9        Later, I was contacted by another woman Brock

10  harassed on the Internet, who he referred to as, quote,

11  Miss and Bumble Goddess.  Because she wouldn't tell him

12  her real name, he still doesn't know.  She showed me

13  public messages Brock sent to another woman on Venmo in

14  November 2016, in which he wrote, quote, I know Grace

15  will speak to me again someday.  I'm letting the

16  universe guide.  He sent those messages eight months

17  after I received my restraining order, after he

18  attacked me by slandering me on the Internet.  Somehow,

19  he still believed that a relationship between us was a

20  cosmologically-ordained inevitability, that the

21  universe wanted us together, despite my clear and

22  desperate objections.

23       In December 2016, I was notified by Sgt. David

24  McCabe that Brock had filed a complaint about me at my

25  alma mater, the University of St. Thomas.  Since we

—9—

62-CR-17-3155

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    graduated from St. Thomas several years ago, I can only

2    conclude that Brock filed this complaint to further

3    harass and threaten me.  I had to contact my academic

4    advisor to let him know that he might hear from Brock.

5    I was still deployed at the time.  Throughout my entire

6    deployment, I never had nightmares about bomber planes

7    -- or, sorry, about bombs or plane crashes or attacks.

8    I had nightmares about Brock.  I still do.

9        In January 2017, of course, the City Pages asked

10   me to interview for an article about Brock.  According

11   to Brock's irate language in his court filings, he

12   apparently thinks I had a responsibility to keep quiet

13   about what he did to me, that I was obligated to

14   protect his reputation from the truth, even after he'd

15   tried to so aggressively destroy mine with lies.  I

16   gave the interview, not because I wanted revenge, but

17   because Brock hadn't given me a reason not to.

18       In November 2017, Brock started making memes and

19   smear websites about me, starting with

20   majorgracemiller.com, then captaingracemiller.com, and

21   then airforcegracemiller.com.  On the sites, he said

22   that he was the one who broke up with me.  Quote, even

23   after her ex-boyfriend terminated the relationship,

24   Grace Miller still allegedly harassed and domestically

25   abused him, according to court documents.  The document

—10—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    he's referring to is the bogus order for protection

2    petition he had filed.  The headline of the site

3    described me as a, quote, fraudster and psychotic

4    military officer, and the site included photos of me in

5    uniform and links to Air Force stories about my

6    accomplishments and to journals featuring my published

7    academic work.  He also alleged that I'm working in an

8    assassination drone program for the Department of

9    Defense, which isn't true but could jeopardize my

10    safety if the wrong people found it.

11        The worst part was Brock's mention of a colleague

12    of mine, Phyllis Pelky, who died in Afghanistan.  He

13    used Phyllis's death to argue that I have PTSD and am,

14    therefore, mentally unstable.  He even included

15    pictures of his unconscious, blood-spattered mother,

16    claiming that I was responsible for her having a

17    stroke.  The site encouraged readers to contact the

18    city attorney and demand that I be removed from my

19    position at my Air Force Reserve unit and be kicked out

20    of my Ph.D. program.  He's bent on ruining my career.

21        In the months leading up to the trial, Brock took

22    his smear campaign to Twitter, claiming that a

23    Minneapolis lawyer had called me a bitch and tweeting a

24    copy of his bogus defamation suit, which is full of

25    horrible lies about me, directed at my military unit.

—11—

62-CR-17-3166

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    But Brock's victims aren't the only people he

2    slanders.  He's made smear pages about James Street,

3    Patrick Diamond, Elizabeth Clysdale, Karmen McQuitty,

4    Steve Christie, David McCabe, and several other judges

5    and lawyers who have stood up to him.  He even made a

6    video about Yamy Vang, arguing that she cannot possibly

7    be legally competent because she is Hmong and,

8    therefore, cannot properly comprehend English.  He has

9    even defamed you, Your Honor, in a recent writ in which

10    he calls you cruel and petty and states that your voice

11    indicates that you have poor reading comprehension.

12    Given your occupation, I doubt that.

13    And now, ironically, Brock has sued me for

14    defamation in federal court.

15    I've been told Brock's sentence will probably be

16    light because this is his -- supposedly his first

17    offense, but I want Brock to know that I know this

18    isn't his first offense.  I know about the rape victim

19    he claims I fabricated, after he admitted on Facebook

20    to having sex with her which he claims was consensual,

21    and I've spoken to four of the women he wrote Dating

22    Psychos posts about.  Two of his other victims, whose

23    existence I was entirely unaware of, contacted me on

24    Facebook after learning about my case.  One of them

25    told me Brock had raped her, and the other one showed

—12—

62-CR-17-3168

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    me months' worth of harassing contact from him.  So the

2    behavior I've described in this statement isn't an

3    isolated event.

4          Brock would have you believe that he's a First

5    Amendment warrior, fighting for his right to speak out

6    against a, quote, unethical and intemperate military

7    officer.  Nothing could be farther from the truth.  At

8    best, Brock Fredin is a malicious, relentless creep.

9    At worst, he's a serial harasser, stalker, and rapist

10   who uses slander as a tactic to retaliate against his

11   victims and scare them into silence.  He succeeded for

12   years, until he met me.

13         How has this impacted my life?  I can't go on a

14   first date anymore without feeling like I'm going to

15   throw up because I find myself wondering what will

16   happen if I say no and he doesn't listen.  When I hear

17   a loud noise in the middle of the night, I wake up in a

18   panic because my subconscious assumes it's Brock.  I've

19   had to tell my employers and academic advisor what's

20   happened to me just so they know the truth before

21   someone contacts them with a lie.  For the first time

22   in my military career, I have to worry about whether or

23   not I'll have trouble renewing my security clearance

24   because of some psychopath's allegations on the

25   Internet.  My public affairs office knows not to

—13—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   include me in photos and press releases.  My academic

2   advisor wanted a photo and biography of me on his

3   website because he's proud of me, but I said no because

4   I don't want him to be harassed or smeared on Twitter.

5        This nightmare overshadowed so many events in my

6   life: the birth of my goddaughter, the birth of my

7   niece, the death of my grandmother and my grandfather,

8   my military deployment, being selected for my first

9   squadron command, passing my preliminary exams, and

10   writing my entire doctoral dissertation.  For two and a

11   half years, I've had to live with this horror in the

12   back of my mind that a man who wouldn't take no for an

13   answer is still out there somewhere, trying to destroy

14   me.  I don't know if I will ever be free of that.

15   Worst of all, I have an anger and bitterness in me now

16   that I never had before.

17        As I said before, the conviction didn't stop

18   Brock's behavior.  Within hours of the verdict being

19   read in July, Brock's best friend, Anthony Zappin, a

20   New York lawyer and accused wife-beater who is known

21   for being disbarred due to his, quote, unbridled

22   behavior, was already defaming me on Twitter, probably

23   at Brock's behest.  He claimed that the jury was

24   rigged, described one of the jurors as a crackhead, and

25   described me as a drone pilot, bipolar patient, and

—14—

62-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    trained killer.  I am none of those things, but Anthony

2    has adopted the narrative Brock has sought to advance,

3    that I'm deranged and dangerous, a female version of

4    Marlon Brando in Apocalypse Now, when I'm really just a

5    woman who asked to be left alone.  I've had to accept

6    that there might always be ugly, angry, and even

7    violent men trying to hurt me because of Brock.

8        A week after the verdict, Brock announced on

9    Twitter that he was about -- that he was, quote, about

10   to take a donkey expletive on a couple of people and

11   then filed a Writ of Prohibition that illustrated three

12   disturbing points I'd like to address.

13       First, Brock is in deep denial of the truth.  In

14   the writ, he states that he never told me I couldn't

15   date other men, despite at least three documented

16   instances of him telling me that very thing, which Mr.

17   Christie presented in court.  He also alleges that I am

18   a lesbian who is deeply closeted and, even more

19   outrageously, that I was having an affair with another

20   one of his victims, Ms. Catherine Schaefer, a woman he

21   had actually been harassing for years and threatened

22   with, quote, consequences because she continued to

23   reject him.

24       Second, he is still trying to hurt me, and he's

25   using the court to do it.  He himself says in the writ,

-15-

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   my family is extremely Catholic and would never accept

2   it if I was gay, but he chose to make that allegation,

3   put his writ on Scribd and post it on Twitter, so

4   clearly he hopes that his allegations will somehow be

5   discovered by my family and damage my relationship with

6   them, perhaps forever.  What he tried to do is

7   unfathomably cruel.

8        Third, in spite of all this, he still wants a

9   relationship with me and thinks he has the right to

10  communicate that via the court.  He says four times in

11  the writ that he still cares about me and even says

12  that he hopes I will speak to him again someday.  You

13  would think that after everything he's tried to do to

14  me, after all of my efforts to get the Court to keep

15  him away from me, he would have realized there's

16  absolutely no chance I will ever speak to him again on

17  amiable circumstances.  Meanwhile, Brock has been

18  self-congratulatory, labeling himself a fighter for his

19  persistence.  It's bewildering.

20       Brock is still deluding himself.  He insists that

21  he is a victim of a corrupt and inept court system and

22  denies that his behavior toward me and toward women in

23  general is in any way troubling or abnormal.  I'm not

24  sure the Court -- anything the Court can prescribe as a

25  sentence can ever change that.  I just ask the Court to

—16—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   select the sentence that will most likely result in

2   Brock finally leaving me alone.  That's all I've wanted

3   from the beginning.

4        Thank you for your time and for listening to my

5   story.  Thank you.

6            THE COURT:  Thank you, Ms. Miller.

7        Mr. Christie.

8            MR. CHRISTIE:  Your Honor, Mr. Fredin is now

9   a convicted stalker.  The jury has spoken that truth.

10  In the thousands of cases that I've handled in my

11  30-year career, I've never encountered a more defiant

12  or more recalcitrant defendant than Brock Fredin.  He

13  has challenged fundamental assumptions of this court's

14  legitimacy and the quality of our criminal justice

15  system.  So I propose that we step back to see what is

16  right in front of us.

17       Corrective justice is applied where a person

18  wrongfully interferes with the rights of another, and

19  Grace Miller's loss here cannot be restored.  But it

20  must be recognized, it must be acknowledged, and this

21  offender must be held accountable.  We each have moral

22  and legally enforceable duties to each other, as

23  citizens and fellow human beings, and justice is a

24  matter of how each person is treated when resolving

25  conflict.  Justice is a matter of obligation, whether

—17—

RAMSEY COUNTY DISTRICT COURT

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   it is between people or between a governmental

2   institution, such as this court, and the people it

3   serves.  And, Your Honor, enforcement goes hand in hand

4   with obligation.

5        Justice requires an agent, and it is this court.

6   The people have established courts to deliver such

7   justice.  It must be impartial.  It's the opposite of

8   arbitrariness.  And when two cases are alike, they

9   should be treated in the same way, but when cases are

10  unusual and unlike any other, a different or uncommon

11  treatment is required.  We must avoid the routine of

12  the docket, the routine of the calendar.  Each and

13  every case deserves our attention.  We should not be

14  inert or dulled to the importance of what takes place

15  in this impressive courtroom.

16       At January's investiture ceremony, Your Honor

17  spoke of your lodestar principle, the great importance

18  of kindness.  Kindness is a concern and a consideration

19  for others, but I would submit that kindness does not

20  require leniency to address serious wrongs, and it is

21  not unkind to be just.

22       The execution of a sentence, the one-year sentence

23  allowed by law, is justice.  Probation is not

24  appropriate in this case.  The word probation comes

25  from a Latin word that means the act of proving.

—18—

RAMSEY COUNTY DISTRICT COURT

62-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    Probation is for people who are believed to be both

2    willing and capable of reform.

3         Mr. Fredin, however, is unwilling to change.  He

4    has shown that time and time again over the last

5    several months, over the last few weeks, even the last

6    few days with the petition that he filed with the Court

7    of Appeals on Monday.  He will not refrain from this

8    sort of wrongdoing, and in his actions and in his

9    filings and in his own words, he shows us proof of who

10   he is, how he belittles others that are attached to

11   this case, how he minimizes his actions, and how he

12   shifts blame to others for his own actions.  The

13   punishment should fit the offender and not merely the

14   crime.

15        I will not repeat the arguments that I wrote in my

16   memorandum, but they are to be inserted here.

17        So in this week's petition that he filed, he

18   refers to this particular charge as, quote, a petty

19   accusation, and he uses the word petty 14 times in that

20   petition.  And in that same petition, he accuses the

21   Ramsey County bench of, quote, colluding with

22   litigants.  He has no respect for the law.  He has no

23   respect for the agents of justice.  He has little

24   respect for others.

25        So, Your Honor, I respectfully submit this Court

-19-

62-CR-17-3166

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    cannot demand Mr. Fredin's respect, but this Court

2    today can command his respect with a just sentence.

3         Thank you.

4         THE COURT:  For clarity, Mr. Christie, the

5    memorandum of law has asked the Court to follow by the

6    recommendations of the presentence investigation order?

7         MR. CHRISTIE:  Yes, Your Honor, and there's

8    alternative recommendations.  The State seeks the

9    primary recommendation at the top of the recommendation

10   page.  The State seeks an execution of one year in the

11   workhouse.

12        THE COURT:  Thank you for that clarity.  Does

13   Probation wish to be heard?

14        MR. BARKMAN:  You asked me to speak on

15   whether or not Probation can monitor the defendant's

16   Internet access, and I think Ramsey County does do

17   that, but it appears that he's living in Wisconsin.  So

18   I'm not sure.

19        THE COURT:  All right.  So we have a layer of

20   challenge?

21        MR. BARKMAN:  Yes, but I'm sure they're able

22   to do the same things we do, so.

23        THE COURT:  Well, actually, that is a good

24   thing about Internet.  You can monitor from anywhere

25   around the world, correct?

-20-

62-CR-17-3156

1    MR. BARKMAN:  Yes.

2    THE COURT:  Thank you, for that information.

3    MR. BARKMAN:  Thank you.

4    THE COURT:  Mr. Wenger.

5    MR. WENGER:  Thank you, Your Honor.  What

6    struck me most significantly is my client is 34 years

7    old, and he has been able to go the 34 years of his

8    life without accumulating any criminal record --

9    misdemeanor, gross misdemeanor, or felony.  The only

10   contact that he's had with the law is minor traffic,

11   and he currently has a valid driver's license.  So when

12   the State is asking for a maximum sentence on somebody

13   with no criminal record, that is quite shocking to this

14   defense attorney.

15   Probation, as the Court is well aware now, was

16   doing a bifurcated recommendation.  The first part was

17   asking for the maximum, and the second part was asking

18   for 120 days, executed, and supervision for two years.

19   If the Court is concerned about my client, the best

20   thing to do is put him under supervision.  This Court

21   has the opportunity to have him supervised through

22   Probation for a full two years.  If there is any

23   problems during that two-year period, he will be back

24   in front of this Court on a probation violation, and

25   this Court can decide what appropriate additional

—21—

RAMSEY COUNTY DISTRICT COURT

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

```
 1           consequences are appropriate.  To sentence somebody to

 2           a maximum has never been done in my 34-year career on a

 3           first offense with no criminal record.  I urge the

 4           Court to consider giving him a sentence of five days,

 5           credit for the five days he's already served, and place

 6           him on probation for a period of two years, with 365

 7           days over his head.  I ask the Court to waive the $75

 8           public defender fee.  I ask the Court to limit his fine

 9           to no more than $50.  My client is unemployed and has

10           been unable to get employment since this incident took

11           place.  He has been successful prior to this.  As the

12           Court is well aware, he has both a bachelor's and a

13           master's degree and that he was gainfully employed as a

14           computer programmer.  That is not the case anymore, and

15           that's why he qualifies for our services.

16                I ask the Court to sentence him to probation.  And

17           we are aware of the recommendations of Probation, and

18           my client is ready, willing, and able to prove to this

19           Court that he can be successful during a probationary

20           period.

21                If the Court is considering giving him any jail

22           time, I ask the Court to allow him to participate in

23           any programs where he would otherwise be qualified for,

24           specifically, and not limited to, work release.

25                I would also ask the Court for a 30-day
```

—22—

62-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    stay-to-serve so my client can secure employment so

2    that he may qualify for work release.  As the Court is

3    aware, he's not employed now, and it's my understanding

4    that at the workhouse he needs to have a work history

5    of 30 days before he might qualify.  I spoke to my

6    client about finding a job that is even a menial job,

7    even janitorial or flipping burgers at McDonald's,

8    where he can prove to his employer and to society that

9    he can be gainfully employed again.

10       Therefore, I ask the Court to use the Court's

11    power to supervise him for two years, which is twice as

12    long as if the Court would follow the recommendations

13    of Probation and the State and execute his sentence on

14    somebody with no criminal record.

15       My client wishes to address the Court at the

16    appropriate time, as well.

17       THE COURT:  And, Mr. Fredin, what would you

18    like this Court to know before I sentence you?

19       DEFENDANT FREDIN:  Grace Miller is a violent

20    stalker.  Indeed, Grace Miller used the April 28, 2017,

21    search warrant execution to terrorize a Wisconsin

22    family and procure evidence in two civil cases.  Grace

23    Miller lied for years about her knowledge, while

24    simultaneously pressuring the St. Paul City Attorney's

25    office to intentionally cover up her conduct with

—23—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1  brutal beatings, actions no different than a lynch mob

2  assaulting and raiding a home.  As I continue to

3  express my intentions in Ramsey County Court, Grace

4  Miller targeted me with unlawful contempt threats,

5  arrests, assaults, and detainments so that she could

6  take advantage of me when I did not have the capacity

7  to object or say no.

8      Grace Miller arranged for a group of ten men to

9  violently assault, kidnap, and bind my girlfriend and

10  I, threatening us with automatic assault rifles if we

11  dare move while we were kicked, punched, dragged, and

12  painfully bound, naked for hours.  Much of this

13  violence is horribly unspeakable.

14      The evidence supporting these allegations is

15  overwhelming, which include numerous witnesses, sealed

16  documents, photographs, and permanent scars on my body

17  as a result of the physical violence.  If Grace Miller

18  were a man, she would be in prison for many years.  She

19  is yet to be charged with felony stalking, false police

20  reports, obstruction of justice, and so on.

21      When my girlfriend and I, who I've been with

22  long-term for two years, report this criminal act,

23  Grace Miller methodically uses the legal system to

24  repeatedly silence me, attacks me for speaking up, and

25  physically coerced me to attend legally required

—24—

1   meetings, to arrest me for the petty accusations

2   showing up.  Most importantly, Grace Miller engages in

3   extra-- extrajudicial acts, excuse me, including

4   creating sensationalized tabloid articles to destroy

5   the professional livelihoods of her victims, while

6   mocking and laughing at them.

7       Sadly, at the same time, my girlfriend's mother

8   was diagnosed with a terminal cancer.  While my

9   girlfriend and I grieved the health of her mother,

10  Grace Miller committed violent domestic assaults

11  against us.  During the violent domestic assault and

12  robbery, Grace Miller and her attorney, along with her

13  attorney's mother, laughed and mocked us, depriving us

14  of a precious financial resource in the last weeks and

15  months before her mother died.

16      Grace Miller's victims will never be able to work

17  again, feel safe around men, own a home, or even

18  travel.  Grace Miller has permanently destroyed

19  multiple families.  Her victims suffer from sudden

20  convulsions, mental fog, and complete memory loss,

21  attributed to the Post-Traumatic Stress Disorder.

22      One of Grace Miller's victims, my girlfriend, the

23  chief nurse and manager of the busiest trauma unit in

24  St. Paul, was physically attacked and then robbed.

25  Despite being professionally experienced with caring

—25—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   for and witnessing trauma, including sexual assaults,

2   on a daily basis, she now suffers from insomnia, night

3   sweats, flashbacks, extreme alertness, emotional

4   numbing, and overwhelming fear as a result of the sheer

5   intensity of Grace Miller's violent acts.  Much of this

6   extreme torture is unspeakable.

7        Additionally, Grace Miller testified in open court

8   to stalking my social media profiles and purchasing an

9   invisible spy subscription on match.com to view my

10  profile in order to bait or solicit an HRO violation

11  over the petty accusation of my profile showing up on

12  her dashboard.  Grace Miller failed to provide this

13  accurate testimony throughout any proceeding

14  whatsoever.

15       Grace Miller has killed me.  When I die, my blood

16  will be on her hands.  Many days, I wish that I was not

17  alive.  Grace Miller raped my identity.  Grace Miller

18  destroyed my life, using petty allegations.  Grace

19  Miller has no idea the destruction she has caused and

20  misery she has put my girlfriend and I through, let

21  alone my family.

22       My girlfriend's life has been equally destroyed

23  due to Grace Miller's behavior.  In fact, Grace Miller

24  has no concern for others, nor would she care what

25  others experience as the result of her behavior.  I am,

—26—

62-CR-17-3155

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    essentially, homeless.  I'm on food stamps.  I have not

2    worked in two years.  Grace Miller is a destructive

3    human being.

4         Who does Grace Miller think she is?  What goes

5    around comes around.  Did Grace Miller even think of my

6    mother or family when she asserted a vicious tabloid

7    false campaign against me?  Did she realize my mother,

8    one of the first female military officers in the

9    Minnesota National Guard, had a stroke, lost her

10   ability to walk normally during her tabloid campaign?

11   Does Grace Miller realize that she is negatively

12   impacting others?

13        All of this because she was contacted by Catherine

14   Schaefer in October 2015, long before any of her

15   restraining orders, which she has failed to disclose to

16   this Court, and decided to pursue vindictive, false

17   allegations.  Grace Miller failed to be truthful and

18   could have easily talked through the issue, instead

19   choosing to block and cease communication whatsoever

20   when things could have been easily worked out or talked

21   through.  Many of Grace Miller's actions are evil.  She

22   has destroyed multiple families.

23        When Grace Miller and I were dating, we got along

24   better than anyone.  We had a natural chemistry and an

25   unrivaled connection.  I fell for Grace Miller, perhaps

—27—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   fell in love with her briefly, and during those moments

2   of weakness, she destroyed me, choosing to mock me for

3   being vulnerable, for falling in love with her.  This

4   is the kind of sociopath Grace Miller is.

5      Grace Miller is yet to be charged with criminal

6   stalking, obstruction of justice, making material false

7   statements, or conspiracy she has conducted to

8   vindictively initiate eight state lawsuits against me.

9   A part of me still loves Grace Miller, obviously, and

10  wants her to cease her malicious actions.  Grace Miller

11  needs to communicate exactly what she wants me to do.

12  I implore her to write down a list, through her

13  attorney.  I will follow through with whatever Grace

14  wants.

15     The only thing I want -- the only thing I wanted

16  was to take care of Grace.  Hopefully, in the future,

17  whenever that is, these things can be solved, using

18  reasonable discourse.  I implore Grace Miller,

19  Catherine Schaefer, and Lindsey Middlecamp to choose

20  that option.  All I have ever wanted was for Grace

21  Miller to be happy and to give all that I could

22  possibly give to her.  Grace Miller needs to figure out

23  how to settle and stop this, use the lesson from her

24  father and learn to forgive.  Grace's father said, one

25  of her main character defects was the fact that she has

—28—

RAMSEY COUNTY DISTRICT COURT

62-CR-17-3156

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    trouble forgiving.  So I implore Grace to forgive and

2    move on and solve these issues, using reasonable

3    discourse, instead of destroying multiple families.  If

4    not, however, this will go on forever, and I promise

5    that.

6         And then, additionally, I just want to thank Court

7    Reporter Libby, Clerk Lauren Durand, and I'd also like

8    to thank a few Ramsey County Sheriff's deputies for

9    stepping in and mediating situations when appropriate.

10   I also want to thank Public Defender Bruce Wenger for

11   coming in here and stepping in.

12        And given the fact -- in closing, given the fact

13   that I haven't worked in two years, I have no criminal

14   history, all of the allegations that Grace Miller

15   raised are not only false but they're not criminal

16   acts.  I was convicted for having a match.com profile,

17   this is what this case boils down to, and so I hope the

18   Court can take that into consideration and avoid

19   placing me into a system and choosing the least

20   punitive option.

21        Thank you.

22        THE COURT:  Mr. Fredin, is there anything

23   else you'd like for this Court to consider before I

24   sentence you?

25        DEFENDANT FREDIN:  No, ma'am.

                                                    —29—

62-CR-17-3168

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    THE COURT:  So this is my chance to speak

2  with you, and I'm not asking for your feedback at this

3  time, so please don't offer any.

4    I'm going to read back to you some of the things

5  you said this morning, your characterization of Ms.

6  Grace Miller, what this case has done to you, and what

7  it has meant to you to go through this process.  I took

8  copious notes.  I didn't want to not quote you

9  accurately.  Here are some of the things that you said.

10  Sometimes when others read back to us what we say, it

11  might sound a little different.

12    You characterized Ms. Grace Miller as having

13  engaged in petty accusations against you and that Ms.

14  Miller uses the legal system to attack you and that Ms.

15  Miller is a violent stalker and that she has targeted

16  you and that Ms. Miller has taken advantage of you and

17  that Ms. Miller has caused you permanent emotional

18  harm.  And that Ms. Miller's behavior has resulted in,

19  and I quote, sensationalized postings of you, used even

20  the word that Ms. Miller has raped your identity.  That

21  is an incredibly strong and powerful word, and I will

22  add, that was grossly misused by you in every which way

23  possible.

24    And if this Court is speaking rather slow and

25  every third word is taking a break, as you so noted,

—30—

62-CR-17-2158

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    it's because I want to make sure that you pick up on

2    everything I say.  If you have not understood me

3    because of the way I speak, I encourage you highly to

4    ask Mr. Wenger, who has dutifully, zealously

5    represented you throughout this proceeding, after

6    today's court hearing, of what my order means.  If you

7    find it difficult to comprehend this Court, based on

8    your judgment of me and my physical appearance, again,

9    I implore you to sit down with Mr. Wenger, go line by

10    line over exactly what the Court's sentencing order is.

11    I will not dignify anything else you have said or made

12    assumptions about other officers of the court, the city

13    attorney's office, specifically including Ms. Yamy

14    Vang.

15        You have further said, Ms. Miller has no concerns

16    for others.  You have said, I, Brock Fredin, am

17    homeless because of Ms. Miller's behavior.  You have

18    said, Ms. Miller is destructive.  You have asked the

19    question, and I repeat it back to you, who does Grace

20    Miller think she is?  I will turn the question on you,

21    sir.  Who does Brock Fredin think he is?  You're going

22    to have a lot of time -- quiet time, I might add -- to

23    think about, who is Brock Fredin?  Who does he want to

24    be in the future?

25        You asked, did Ms. Miller think about what she did

-31-

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1      to my mother?  You asked, did Grace Miller realize the

2      negativity she has impacted on others?  You said, Ms.

3      Miller detailed and pursued false, vindictive

4      allegations against you.  You said, why couldn't Ms.

5      Miller just have easily talked this out?  You said, and

6      I quote, Ms. Miller is evil -- or that she's acting in

7      an evil manner.

8           This Court would rarely ever consider anyone evil,

9      no matter what their behavior is, no matter what crime

10     they've done.  I generally like to believe people are

11     trying their best with what they have.  I generally

12     like to give individuals the benefit of the doubt.

13          You, Mr. Fredin, however, I cannot give you the

14     benefit of the doubt.  You have callously used the word

15     evil and imposed it on Ms. Miller.  For you to turn the

16     tables around so severely tells this Court only one

17     thing:  that you are a deeply deranged, narcissistic,

18     psychotic, sociopathic individual.  I am no

19     psychologist, nor do I pretend to be one, but that is

20     the individual that you have portrayed yourself to this

21     Court.

22          And Mr. Wenger's right.  It is rare for any

23     jurist/any judge to give a full sentence to someone who

24     comes before the Court for what appears to be their

25     first conviction for a criminal offense.  You had the

—32—

62-CR-17-3166

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    benefit of Mr. Wenger's representation this morning.

2    He has been around our court system for a long time.

3    He knows the law.  He knows the procedure.

4        The Court does not take you to be any ordinary

5    man.  Your case is like no other.  You are like no

6    other.  Your action has been extraordinarily different.

7    How has it been different?  You have misused and you

8    have abused the legal system to highest degree for your

9    interest and your benefit.  More specifically, you have

10   misused and abused the Internet, social media, Twitter,

11   YouTube, social dating websites, to play -- and I want

12   you to hear me carefully, because these are words that

13   you've used on others -- to play cruel, twisted,

14   psychological mind games on Ms. Miller.  That is what

15   you have done, and that is what you're likely to

16   continue to do.

17       Don't make any mistake, Mr. Fredin, that I

18   actually think anything I say this morning will impact

19   you, because I don't.  Throughout the jury trial, you

20   specifically said in one of your messages, among the

21   many messages you sent to Ms. Miller -- you said, this

22   is just me, Brock Fredin, playing mind games with you.

23   That was your exact words to Ms. Miller.

24       How are you different?  You have shown absolutely

25   no sense of a grip on reality.  To this very moment,

—33—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    you still claim to implore your love for Ms. Miller.

2    It is astounding to this Court how your sense of

3    reality is so warped and so deranged.  If you have not

4    understood Ms. Miller up until this point, let this

5    Court make it very clear to you, because you've asked

6    her to communicate what she wants.  Ms. Miller wants

7    you to leave her alone, both in person and all -- in

8    every form of social media, on the Internet.  Do not

9    contact her lawyer.  Do not post anything about her

10   anymore, period.  Do not contact her, period.  That is

11   what Ms. Miller wants.

12       You have no awareness, Mr. Fredin, of what your

13   behavior has done to Ms. Miller or others.  It is you

14   who lacks that insight and not Ms. Miller.  You have no

15   awareness nor do you care to gain insight on the

16   emotional harm that you have caused Ms. Miller or the

17   fear of possible physical harm by Ms. Miller, but above

18   all, Mr. Fredin, you have no awareness, and I might

19   add, nor do you care to have any awareness, that you

20   have violated the very core of Ms. Miller's sense of

21   personal safety.  As human beings, everyone deserves to

22   feel safe.  You have violated that.  You have taken

23   that away from Ms. Miller.

24       You have mocked Ms. Miller throughout these

25   proceedings.  You have minimized in every possible way

—34—

62-CR-17-3155

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   the harm you have done onto her.  You have no respect

2   whatsoever for our legal system and the laws, the laws

3   that have been imposed upon you.  The violation of the

4   harassment/restraining order stems out of that grave

5   disrespect for the law.  You have no insight into how

6   this behavior is attempting to smear, destroy Ms.

7   Miller's personal, academic, and professional life, and

8   how that is just simply wrong.

9       If you lost your job, sir, or if you lost your

10   sense of whatever dignity you had, it is because of

11   your own doing.  You've also done more harm to Ms.

12   Miller along the way.  You have not once shown an

13   interest or desire in understanding that.

14       Again, I don't pretend to be a psychologist, but

15   if I were to make an observation of you based on your

16   demeanor throughout these proceedings, I would almost

17   say, you seem to enjoy the cruelty that you have done

18   onto Ms. Miller.  It has been just a mind game, as you

19   said so yourself, that you enjoy playing with Ms.

20   Miller.

21       For all of these reasons, justice requires that

22   this Court does the following:  First, I'm going to

23   make it very clear to you, sir, Probation will actively

24   -- actually, strike that.

25       The Court will accept the jury's finding of guilt

-35-

1    as to Brock William Fredin, after having gone through a

2    jury trial, in Count 1, the gross misdemeanor stalking.

3    The Court will also accept the jury's finding of guilt

4    as to Count 2, the misdemeanor violation of restraining

5    order.  I will adjudicate you as to Count 1; however, I

6    will not adjudicate you as to Count 2.

7        Accepting the plea of guilty, I hereby adjudicate

8    you as to Count 1 and sentence you as follows:  You are

9    to serve 365 days at the workhouse, pay a fine of $50,

10   plus $86 in court costs, for a total of $136.  I will

11   waive the public defender fee.

12       Thank you, Mr. Wenger, for stepping in.

13       You shall serve 365 days at the workhouse.  You

14   are to be given credit for the five days you've already

15   done.  You are to be taken immediately into custody.

16       Mr. Christie, because I've executed the sentence,

17   am I barred from signing a Criminal Domestic Abuse

18   No-Contact Order?

19          MR. CHRISTIE:  Yes, Your Honor.  The victim,

20   Ms. Miller, has the benefit of a Harassment/Restraining

21   Order prohibiting the defendant from having any contact

22   with her for the next 50 years.

23          THE COURT:  And I did read that.  It was

24   five-zero, Mr. Fredin, in case you didn't quite catch

25   it.

—36—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1   MR. CHRISTIE:  As a result of the criminal

2   sentence in which you executed the entire year, the

3   appropriate act would be to cancel the current Criminal

4   No-Contact Order.  Because the Court has executed the

5   full sentence, there is no probation in which to

6   enforce any probationary no-contact order.

7   THE COURT:  So let me sign that cancellation

8   of the DANCO, please.  Mr. Wenger, did you wish to be

9   heard?

10   MR. WENGER:  Yes, Your Honor.  My client came

11   with his mother today.  His mother has recently had a

12   stroke and she is in a wheelchair, and he is her

13   transportation home.  I'm asking the Court to consider

14   a stay-to-serve so that he can provide for his mother

15   before he serves the entire sentence that the Court has

16   imposed today.

17   THE COURT:  This Court is sympathetic to the

18   fact that his mother is reliant on Mr. Fredin for

19   transportation.  However, under the unusual

20   circumstances, I will not permit Mr. Fredin to turn

21   himself in.  His mother will be expected to make other

22   arrangements.

23   Thank you.

24   MR. CHRISTIE:  Your Honor, may counsel

25   approach?

-37-

62-CR-17-3158

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

```
 1                    THE COURT:  Yes.

 2                    (Whereupon, a brief off-the-record discussion

 3          was held.)

 4                    THE COURT:  For clarity, there is not a

 5          Domestic Abuse No-Contact Order in this case.  Thank

 6          you, everyone.  That'll be all.

 7                    (Whereupon, the matter came to a close.)

 8                         *           *           *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

—38—

Filed in District Court
State of Minnesota
2/1/2019 10:45 AM

1    STATE OF MINNESOTA    )
                           )    SS.
2    COUNTY OF RAMSEY      )

3                     REPORTER'S CERTIFICATE

4

5        Be it known that Libby Gulbranson took the

6    proceedings in the case of State of Minnesota v. Brock

7    William Fredin, on October 17, 2018, at the Ramsey County

8    Court House, St. Paul, Minnesota;

9        that the proceedings were recorded in stenotype and

10   then reduced to print by means of Computer-Assisted

11   Transcription under my direction and that the transcript is

12   a true record of the proceedings, to the best of my ability;

13       that I am not related to any parties hereto nor

14   interested in the outcome of the action.

15       Dated this 14th day of December, 2018.

16

17

18                       /s/ Patricia J. Kinning

19                       _____
                         Patricia J. Kinning
20                       Official Court Reporter to the
                         Honorable Lezlie Ott Marek
21                       25 W. Seventh Street, #B404
                         St. Paul, Minnesota 55102
22                       (651) 266-8329

23

24

25

                                                        -39-

                 RAMSEY COUNTY DISTRICT COURT

# Exhibit B

Filed in the Second Judicial District
Ramsey County, MN

State of Minnesota   Nov 17 2016 3:01 PM     District Court
Ramsey County            Second Judicial District

| Court File Number: | **62-HR-CV-16-411** |
| Case Type: | Harassment |

Catherine Schaefer Vs Brock William Fredin

**Order Granting
Harassment Restraining Order
After Hearing**
(Minn. Stat. §609.748)

This matter was heard by Clysdale, Elizabeth, Judge/Referee of District Court, on November 17, 2016.

Appearances:
 BROCK FREDIN, Respondent, present    NATHAN HANSEN, Attorney, present
 Catherine Schaefer, Petitioner, present   PETER MAYER, Attorney, present

Now, therefore, based upon the evidence adduced and upon all the files, records and proceedings herein, the court finds:

1. ☐ The Respondent denies the allegations of the Petition but has no objection to the issuance of a Restraining Order. The court makes no findings of harassment.

2. ☒ There are reasonable grounds to believe that Respondent(s) has engaged in harassment of Petitioner(s) or the minor child (ren) or ward(s) of Petitioner by committing the following acts:

  ☐ physically or sexually assaulted the Petitioner(s) as follows:_____
  ☐ followed, pursued or stalked the Petitioner(s) as follows:_____
  ☐ made uninvited visits to the Petitioner(s) as follows: _____
  ☐ made harassing phone calls to the Petitioner(s) as follows: _____
  ☐ made threats to the Petitioner(s) as follows: _____
  ☐ frightened Petitioner(s) with threatening behavior as follows: _____
  ☐ called the Petitioner(s) abusive names as follows: _____
  ☐ damaged Petitioner's property as follows: _____
  ☐ broke into and entered the Petitioner's residence as follows: _____
  ☐ stole property from the Petitioner(s) as follows: _____
  ☐ took pictures of the Petitioner(s) without permission of the Petitioner(s) as follows: _____
  ☐ did acts repeatedly that meet the legal definition of "targeted residential picketing" as follows:_____
  ☐ attended public events after being notified that Respondent's presence at the events is harassing to Petitioner(s) as follows: _____
  ☒ other: Petitioner made it clear to the Respondent in 2014, and several times thereafter, that she did not want any contact. Respondent proceeded to contact the Petitioner, as set forth in exhibit P2, knowing that she did not want any contact with him. The contact, as set forth in exhibit P2, was repeated, unwanted, and had the effect of having a substantial adverse effect on Petitioner's security and privacy.

3. ☐ The harassment has or is intended to have a substantial adverse effect on Petitioner's safety, security, or privacy.

4. ☐ The relief granted by this order may be for a period of up to 50 years based on the finding that:
  ☐ The petitioner has had two or more previous restraining orders in effect against the same respondent; or
  ☐ The respondent has violated a prior or existing restraining order on two or more occasions.

### It is Ordered:

1. ☒ Respondent(s) shall not harass ☒ Petitioner ☐ Petitioner(s) minor child (ren) or ward(s).
  List minor child (ren),wards included in this Petition:

2. ☒   Respondent shall have no direct or indirect contact with ☒ Petitioner ☐ Petitioner's minor child/ren or ward(s), including any visits to or phone calls to the protected person(s), contact via electronic means such as email or social networking sites, threats or assaultive behavior to the protected person(s), damaging or stealing property belonging to the protected person(s), breaking into and entering the protected person(s) residence, and/or taking pictures of a protected person without permission of the Petitioner.

3. ☒   Respondent(s) is prohibited from the Petitioner's home at: <u>CONFIDENTIAL</u> (address).

4. ☒Respondent(s) is prohibited from the Petitioner's job site at <u>CONFIDENTIAL</u> (address).

5. This Order shall remain in effect until <u>November 17, 2018</u>. Date (not to exceed two years unless findings made to support longer order)

6. The Court Administrator shall send a copy of this Order to the following law enforcement agency(s):
<u>Ramsey</u> County Sheriff's Department and <u>St. Paul</u> Police Department. **Every police department and sheriff's office in the United States, include those affiliated with tribal and territorial lands is responsible for enforcing this Order under 18 U.S.C. § 2265 Full Faith and Credit of Protective Orders.**

7. If Respondent is an organization, this order ☐ shall / ☐ shall not  apply to all members of the organization.

8. Other: ____

9. The sheriff of any county in the State of Minnesota shall perform the duties relating to serving this Order without charge to Petitioner.

*NOTICE*

**Any conduct by the Respondent in violation of the specific provisions provided in the "It Is Ordered" section above constitutes a violation of this Harassment Restraining Order. A police officer shall arrest the Respondent without warrant and take the Respondent to jail if the police officer believes the Respondent has violated this Order, and shall hold the Respondent in jail for at least 36 hours, excluding the day of arrest, Sundays, and legal holidays, unless the Respondent is released by a judge or judicial officer.**

**Violation of this Harassment Restraining Order may be treated as a misdemeanor, gross misdemeanor, or felony. A misdemeanor violation may result in a sentence of up to 90 days in jail and/or a fine of $1000.00. Some repeat violations are gross misdemeanors that may result in a sentence of up to one year in jail and/or a $3,000.00 fine. Other violations are felonies that may result in a sentence of imprisonment for up to five years and/or a fine of $10,000.00. A person who engages in a pattern of harassing conduct is guilty of a felony and may be sentenced to imprisonment for up to ten years and/or a fine of $20,000.00.**

**If the court grants this Harassment Restraining Order for a period of up to 50 years under Minn. Stat. §609.748 subd. 5, the Respondent must wait 5 years to seek modification of the Harassment Restraining Order.**

THE FOREGOING ORDER IS RECOMMENDED:

*EClysdale*

Dated: _____

Clysdale, Elizabeth (Referee)
Nov 17 2016 3:01 PM
Referee of District Court

THE FOREGOING ORDER IS CONFIRMED:

Dated: _____

_____
Judge of District Court

State of Minnesota                                                    District Court
Ramsey County                                                  Second Judicial District
                                            ┌─────────────────────────────────────────┐
                                            │  Court File Number: 62-HR-CV-16-411      │
                                            └─────────────────────────────────────────┘
                                                              Case Type: Harassment

                                                          **Notice of Filing of Order**

---

Catherine Schaefer vs BROCK WILLIAM FREDIN

You are notified that on 11/17/2016 the attached order was filed.

Dated: 11/17/2016

                                        Court Administrator
                                        Ramsey

Exhibit C

# FILED

JAN 2 8 2016

State of Minnesota
Ramsey County

By ___MP___ Deputy

District Court
Second Judicial District

| Court File Number: **62-HR-CV-16-46** |

Grace Elizabeth Miller Vs Brock Fredin

**Order Granting Petition for**
**Ex Parte Harassment Restraining**
**Order** (Minn. Stat. §609.748)

---

Based upon Petitioner's Affidavit and Petition for a Harassment Restraining Order and other information provided to the Court, THE COURT FINDS:

There is an immediate and present danger of harassment to justify temporary relief.

☒ There are reasonable grounds to believe that Respondent has harassed Petitioner (or minor children included in the petition) as follows:

☐ Physically or sexually assaulted the Petitioner;
☐ Followed, pursued or stalked the Petitioner;
☐ Made uninvited visits to the Petitioner;
☐ Made harassing phone calls to the Petitioner;
☐ Made threats to the Petitioner;
☐ Frightened Petitioner with threatening behavior;
☐ Broke into and entered the Petitioner's residence;
☐ Damaged the Petitioner's property;
☐ Stole property from the Petitioner;
☐ Took pictures of the Petitioner without permission of the Petitioner;
☐ Did acts repeatedly that meet the legal definition of "targeted residential picketing;"
☐ Pattern of attending public events after being notified that Respondent's presence at the events is harassing to Petitioner;
☒ Other: <u>SEE ALLEGATIONS (INCORPORATED IN PETITION)</u>

☒ The harassment has had or is intended to have a substantial adverse effect on Petitioner's safety, security, or privacy.

☐ Petitioner requested a court hearing.

**IT IS ORDERED:**

1. ☒ **The request for temporary relief is granted** and:

   ☒ Respondent shall not harass ☒ Petitioner ☐ Petitioner's minor child/ren or ward(s). The minor child/ren or wards included in the Petition are: .

*62-HR-CV-16-46*

☒ Respondent shall have no direct or indirect contact with ☒ Petitioner ☐ Petitioner's minor child/ren or ward(s), including any visits to or phone calls to the protected person(s), contact via electronic means such as email or social networking sites, threats or assaultive behavior to the protected person(s), damaging or stealing property belonging to the protected person(s), breaking into and entering the protected person(s) residence, and/or taking pictures of a protected person without permission of the Petitioner.

☒ Respondent is prohibited from being at Petitioner home located at: 1656 Dayton AVE Saint Paul, MN  55104 and/or where the petitioner(s) may reside.

☒ Respondent is prohibited from being at Petitioner's job site located at: University of Minnesota Department of English 207 Lind Hall 207 Church Street SE Minneapolis MN 55455 and/or where the petitioner may be employed.

☐ Other: .

2. ☒ This Restraining Order is in effect until January 28, 2018 unless changed by a later court order. **Respondent can ask the court to change or vacate the Restraining Order by filing a *Request for Hearing* within 20 days of service of the petition.**

3. ☐ **A hearing will be held** on _____ at _____ o'clock _____.m at Ramsey County Juvenile and Family Justice Center, 25 W. 7th Street, Court Room 5A, St. Paul MN 55102

The hearing is scheduled because: ☐ Petitioner requested a hearing ☐ Petitioner requested a restraining order for longer than 2 years and the court wants more information about the need for a longer restraining order.

☐ Other _____

**Respondent shall appear personally in Court for the hearing and explain why the requests made in the Petition should not be granted.  Petitioner shall appear personally in Court for the hearing and harassment.**

4. The Court Administrator shall send a copy of this Order to the following law enforcement agencies: Ramsey County Sheriff's Department and Saint Paul and Minneapolis Police Department which have authority over the residence of the Petitioner(s). **Every police department and sheriff's office in the United States, including those affiliated with tribal and territorial lands, is responsible for enforcing this Order under 18 U.S.C. § 2265 Full Faith and Credit of Protective Orders.**

5. If respondent is an organization, this order ☐ shall ☐ shall not apply to all members of the organization.

6. ☐ Petitioner made a request to keep information confidential.
Petitioner's request is ☐ granted as to the ☐ home address ☐ telephone. This information shall not be accessible to the public, but shall be accessible to court personnel and law enforcement for purposes of service of process, conducting an investigation, or enforcing an order.
OR

*62-HR-CV-16-46*

Petitioner's request is ☐ denied and Petitioner's address and telephone is accessible to the public.

7. Other: _____

8. The sheriff of any county in Minnesota shall perform the duties relating to service of this Order without charge to the Petitioner.

9. It is not a violation of this order if the parties pursue or participate in voluntary mediation through court approved mediation programs. The party wanting to mediate must contact the mediation program directly to arrange it. He/she may not contact the other party directly or through friends or relatives. The mediation programs will determine if mediation is acceptable under Minnesota mediation guidelines (Minn. Stat. § 494.03 and Minn. Gen. R. Prac. 114).

### ***NOTICE***

**If a hearing is scheduled and Respondent does not attend the hearing, a Harassment Restraining Order may be granted. Failure of Respondent to appear WILL NOT be a defense to criminal charges against Respondent for violation of any part of this Order. If Petitioner does not attend the hearing this case may be dismissed.**

**Any conduct by the Respondent in violation of the specific provisions provided in Section 1 above constitutes a violation of this Harassment Restraining Order. A police officer shall arrest Respondent without warrant and take her/him to jail if a police officer believes that Respondent has violated this Restraining Order, and shall hold Respondent in jail for at least 36 hours, excluding the day of arrest, Sundays, and legal holidays, unless the Respondent is released earlier by a judge or judicial officer.**

**Violation of this Harassment Restraining Order may be treated as a misdemeanor, gross misdemeanor, or felony. A misdemeanor violation may result in a sentence of up to 90 days in jail and/or a $1000.00 fine. Some repeat violations are gross misdemeanors and may result in a sentence of up to one year in jail and/or a $3,000.00 fine. Other violations are felonies and may result in a sentence of imprisonment for up to five years and/or a $10,000 fine. A person who engages in a pattern of harassing conduct is guilty of a felony and may be sentenced to imprisonment for up to ten years and/or a fine of $20,000.00.**

THE FOREGOING ORDER IS RECOMMENDED:

Dated: _1-28-16_____      _Ellysdale_____
                                      Referee of District Court

THE FOREGOING ORDER IS CONFIRMED:

Dated:_____      _____
                                      Judge of District Court

**Distribution**

_____ Certified copy or original – Return to Court Administrator with Affidavit of Service attached
_____ Copy for Petitioner(s)                    _____ Copy for Respondent(s)
_____ Copy for file until original returned     _____ Copy for local police department
_____ Copy for Sheriff                          _____ Other: _____

*62-HR-CV-16-46*

State of Minnesota                                    District Court
Ramsey County                              Second Judicial District

Court File Number: **62-HR-CV-16-46**
Case Type: Harassment

**Notice of Filing of Order**

**Grace Elizabeth Miller vs Brock Fredin**

You are notified that on 1/28/2016 the attached order was filed.

Dated: 1/28/2016                         Tama L. Hall
                                         Court Administrator
                                         Ramsey County District Court
                                         25 West Seventh Street
                                         St Paul MN  55102
                                         651-266-5130

*62-HR-CV-16-46*

# Exhibit D

06/29/2016  12:20     8148637002                    PSYCHOLOGY                              PAGE  06/11

# FILED

| State Of Minnesota | JUN 2 9 2016 | District Court |
|---|---|---|

| County Ramsey | By _____ MP _____ Deputy | Judicial District: SECOND |
|---|---|---|
| | | Court File Number: 62HR CA116711 |
| | | Case Type: Harassment |

## Petitioner's Affidavit and Petition for Harassment Restraining Order
### (Minn. Stat. §609.748)

**Petitioner**

| Name: Catherine Schaefer |
|---|
| Address: CONFIDENTIAL |
| **CONFIDENTIAL** |
| Date of Birth:  7/18/1984 |
| On behalf of: (names of minor children who are victims of harassment and their dates of birth) |
| Name:                              DOB: |
| Name:                              DOB: |
| Name:                              DOB: |

vs.

**Respondent**

| (Person harassing you or your minor child) : |
|---|
| Name: Brock William Fredin |
| Address: 1180 Grand Ave Apt 2 |
| **St. Paul, MN 55105** |
| |
| |
| Date of Birth: 12/12/1983 |
| (if known, or approximate age) |

STATE OF MINNESOTA                              )
COUNTY OF   ___RAMSEY_____   ) SS
            *(County where affidavit is signed)*

I understand that I must tell the truth.  I state that:

1. I am the Petitioner in this case.  The victim of the harassment is ☒ me ☐ a minor child for whom I am the parent, legal guardian or stepparent. (If you are the guardian, attach a copy of the order appointing you.)  The name of each victim, other than me, is:

HAR102    State         ENG    Rev 7/15    www.mncourts.gov/forms            Page 1 of 5

06/29/2016  12:20    8148637802                    PSYCHOLOGY                              07/11

2.  a) How many restraining orders have been in effect, ordering Respondent to stay away from the victims you included at #1 above? ☒none ☐ one ☐ two or more.  For each restraining order provide:

| Court File Number, if known | County and State where the court is located |
|---|---|
|  |  |
|  |  |
|  |  |

b) Does Respondent have a current Harassment Restraining Order or Order for Protection against     you?
☐ Yes, Case File Number (if known) _____ ☒No, I am not aware of any.

3.  The following court cases involve me and the Respondent in issues of child custody or parenting time:

| Court File Number | County and State where the court is located |
|---|---|
|  |  |
|  |  |

4.  Respondent has harassed the victim(s) as follows:
- *Check all boxes that apply and give the date and details of each incident.*
- *To get a Restraining order, you must describe actions that meet the legal definition of harassment in Minnesota.  See the Instructions for the definition of harassment.*
- *One incident of physical or sexual assault can meet the definition of harassment.  For any other act, there must be more than one incident.*
- *If you need more space, attach a full sheet of paper and continue your description there. Do not write on the back.*

☐ Respondent physically or sexually assaulted the victim as follows: _____

_____

_____

☒Respondent has followed, pursued or stalked the victim as follows: Brock has been

messaging me since January of 2014.  I have received multiple messages from different

profiles on OKCupid.com, and collarspace.com.  I have also received texts from numbers

that I do not recognize, all saying the same thing indicating that it is him.  His most recent

messages include my advisors' information and threats to escalate if I do not apologize for making him cry. He clearly obtained this information by looking up my program, which indicates a continued obsession with me and my whereabouts spanning two and a half years.

☐ Respondent made uninvited visits to the victim as follows: _____

---

☒ Respondent made harassing phone calls to the victim as follows: I have received text messages since January 2014, after which I told him not to contact me again. He continued until November 2014, and I decided to file a police report. After that, he messaged me again on 12/14/14/, 12/20/14, 2/11/15, 5/7/15, 5/10/15, 3/29/15, 8/12/15 and 8/22/15. By August, I had moved to State College and was told the Minneapolis police could no longer record my complaints. I continued to receive messages every few months, but thought that things were settling and he did not know that I had moved, and so did not file a new report until recent threats. _____

☒ Respondent made threats to the victim as follows: Brock has directly threatened to contact my advisors in my PhD program and make claims that I have caused him psychological harm by continually blocking him. He pasted the advisors' contact information into his messages to let me know he had it. He also published a profile on datingpsychos.com that included my name, location, and PhD program. These results come up before my university credentials when my name and location is Googled, and threaten my education and opportunities to conduct research. _____

☒ Respondent frightened the victim with threatening behavior as follows:   Brock has continued to contact me multiple times despite being told to stop. He has threatened my education and career and also indicated unspecified "escalation" if I do not apologize for making him cry. _____

☐ Respondent broke into and entered the victim's residence as follows: _____

---

06/29/2016  12:20   8148637002   PSYCHOLOGY   PAGE

☐ Respondent damaged the victim's property as follows: _____

_____

_____

☐ Respondent stole property from the victim as follows: _____

_____

_____

☐ Respondent took pictures of the victim without permission as follows: _____

_____

☐ More than once, Respondent has done acts that meet the legal definition of "targeted
residential picketing"     by: _____

_____

☐ I told Respondent not to come to certain public events that I or the children attend because:

_____

After that, Respondent attended public events I/we attended: (List dates, places and name of
events)

_____

These acts by Respondent show a pattern of attending public events while knowing that
attending is harassing to me/children.

☐ Other: _____

_____

5. Describe the effect the harassment has upon the victim's safety, security or privacy:

I have been very distressed by this behavior each time it happens, and increasingly so in the
past month. I have discussed plans with my advisor to postpone a call for research participants
until my online reputation is secured. I have closed down certain profiles on dating sites for fear
that he might find me. I had relevant professional information removed from my program
website. Brock knows details about my sexual interests and orientation, as well as performance
and work history in the adult and sexual health industry. I have had to share these details with
my professional colleagues because they could be damaging out of context. I believe this has

06/29/2016 13:37 8148637002 PSYCHOLOGY PAGE 04/04

changed the way some of my colleagues see me, but it was not something I wanted preceded by

Brock's efforts to make things sound anything less than completely above board.

6. Do you believe the harassment will continue? Why?

I believe the harassment will continue because it has gone on for two and a half years and

only increased in intensity.

7. I ask the Court to issue a Restraining Order as follows: *Check all boxes (a through e) that apply.*

☒ a. Respondent shall not harass ☒me ☐ minor child (ren) for whom I am the parent, legal guardian, or stepparent. List the full names of the minor children included in this Petition: __

☒ b. Respondent shall have no contact with ☒ me ☐ the minor child(ren) listed above.

☒ c. Respondent shall stay away from where I/we live (address) I DON'T WANT HIM KNOWING MY ADDRESS.

☒ d. Respondent shall stay away from my/the victim's job site located at __CONFIDENTIAL__

☐ e. Other: __

8. Court Hearing

*Petitioner: Read these Notices about a Hearing*

- *You have a right to request a court hearing.*
- *If the Judge dismisses your case because it has no merit, no hearing will be held.*
- *The Judge can issue a Restraining Order without a court hearing if the Judge finds there is immediate and present danger of harassment.*
- *If the Judge issues a Restraining Order without a hearing, the Respondent can request a hearing within 45 days of the date the Restraining Order is issued. If Respondent requests a hearing, the court will notify you by mail at least five days before the hearing date.*
- *If there is a hearing, you must attend the hearing and prove that the statements in your Petition & Affidavit are true, and that Respondent's actions are harassment, as defined by Minnesota law.*

*Choose a. or b.*

☒a. I am not requesting a court hearing at this time.

But if the court denies my request for a restraining order because the court finds there is no immediate and present danger of harassment, then (check one) ☒ I want ☐ I don't want a court hearing.

OR

HAR102 State ENG Rev 7/15 www.mncourts.gov/forms Page 5 of 5

☐ b.  I am requesting a court hearing.

9.  I request a Restraining Order for a length of:

☒ 2 years
☐ Until the following date: _____, which is less than 2
years from        today.
☐ Up to 50 years because:
    ☐ I have two or more prior restraining orders against Respondent (listed at #2 above.)
    ☐ Respondent has violated a prior or existing restraining order between us on two or
    more occasions.

**I understand the court will likely schedule a court hearing for any request over 2 years.**

I declare under penalty of perjury that everything I have stated in this document is true and
correct.  Minn. Stat. § 358.116.

Dated: _____ 6/29/16 _____

Signature

Name  Catherine Schaefer

Address _____

City/State/Zip _____

Telephone ( 266 ) 437 4661

E-mail address: cschaefe@gmail.com

*Notice: If your address or telephone
changes, you must give Court
Administration your new information right
away, in writing.*

Catherine Schaefer HRO Affidavit                                                                    1

I am writing to request a harassment restraining order to prevent Brock Fredin from contacting me or posting about me on the internet or social media. The following describes Brock's two and a half year history of harassing and defaming me, beginning with the most recent incident and continuing to describe earlier behavior.

On May 29th at approximately 3 AM, I got a message from a profile in MN saying "I am really lonely, can you talk to me?" I was missing my MN friends, and thinking about an event that was coming up, and the username did not sound like any Brock had previously used. I didn't think it was him. I responded asking where in MN the person was, and in his reply I saw pictures and recognized Brock. The following exchange occurred:



**From: EpicView - Sent 5/29/2016 3:47:46 AM**

I am really lonely. Can you talk to me?

**To: EpicView - Sent 5/29/2016 3:57:29 AM**

Where in MN are you

**From: EpicView - Sent 5/29/2016 4:00:47 AM**

I am in St. Paul. I'm sorry for asking. I don't want to bother. Just no one talks to me. I just feel isolated.

06/29/2016  12:23   8148637002                    PSYCHOLOGY                      PAGE  03/13

Catherine Schaefer HRO Affidavit                                        **2**



*THIS IS WHERE PICTURES SHOW UP, EITHER BECAUSE HE ATTACHED THEM OR BECAUSE THEY ARE PART OF THE PROFILE HE MESSAGED FROM.  THEY WERE NOT VISIBLE IN THE FIRST MESSAGE. I REALIZE IT'S HIM AND BLOCK HIM*

**From: goldfetch - Sent 5/29/2016 4:10:09 AM**

I'm so incredibly lonely. No one will talk to me. I'm hot and still nothing. You blocking me breaks my heart. I'm so hurt. I start to treat all women like shit based on the lessons women like you provide. You're just perpetuating the problem. Fuck you. Seriously. Fuck you.  Why are you so fucking heartless, bitch?  I hope to die.

Catherine Schaefer HRO Affidavit                                                          3

*I THEN BLOCK THIS PROFILE*

**From: GimpKeeper - Sent 5/29/2016 4:14:12 AM**

Since you're studying psychology and a bitch to people online and causing serious mental harm
to others...I'm notifying your PHD people at Penn State, cunt. I hope you get consequences for
your actions, cunt.

**From: GimpKeeper - Sent 5/29/2016 4:18:06 AM**

Sherri Gilliland and Kristin Buss are getting emails. Think about the impact your actions have on
the emotions of others. I am shattered. Absolutely shattered because of your behavior. It
breaks me. I cried several times. Here you are studying psychology and causing emotional
distress to others. I'm sick of dealing with peopple like you. If that's not your program, they'll
find you regardless in whatever program you're in. If you continue to block me and others for
no reason at all I'm going to bring it up even further.   Director of Graduate Studies: Kristin Buss
For information onThe Graduate Programplease contact Sherri Gilliland(814) 863-
1721sbg4@psu.edu Location: Graduate OfficeDepartment of Psychology 125 Moore
Building The Pennsylvania State University University Park, PA 16802-3106

*THESE ARE THE MESSAGES DOWNLOADED FROM COLLARSPACE.COM, ORIGINALS HAVE
CONTACT INFO FOR BOTH SHERRI AND KRISTIN COPIED FROM THE PSU WEBSITE*

**From: GimpKeeper - Sent 5/29/2016 5:50:53 AM**

Tables are reversed on you. Can't be a total dickhead to everyone and get away with it
anymore.

**From: PartyLogic - Sent 5/29/2016 5:52:52 AM**

Got a message from a slave who paid me $40. Wanted to say something to you. Sent me a
screenshot. Ha..... You're a broken Domme? Here's what he said: You can't finally get away with
your dickhead moves. They actually come around and hurt you. Think twice next time before
causing harm and exploiting others. If you apologize to me for wasting my time, causing me
emotional distress, and for making me cry. I will forgo any escalation.

Catherine Schaefer HRO Affidavit                                                           4

Given that the message from PartyLogic followed less than two minutes later, I'm pretty sure
that was him too. He has tried to get me to respond by posing as a female before.

His use of the words "escalation" and direct threat to my status in my PhD program made me
feel extremely vulnerable and scared. State College is a very small town. I worried I would be
putting my roommates at risk too, now that he knew the town where I lived. I was very upset
and called the police and explained my situation. They sent two officers to my house to help
me calm down and take my report. Those officers forwarded the information to detective Jon
Mayer, who contacted me by phone several days later. I had to take the call at work, and leave
work to visit the station and have a discussion with him a few days after. I told him the entire
story and gave him the screennames Brock had used. This was particularly difficult because the
site is an alternative kink site, and I had to discuss aspects of my sex life with a stranger. I have
always been a very mindful member of the kink community. However, given some of the
elements of this kind of play, I was concerned that Brock might misconstrue some things
mentioned in my profile. The police officer was very open minded officer and was very kind.
We agreed that he would call Brock and tell him that police investigation had been requested; I
believe he left Brock a vague voicemail.

In the days following, I remembered that my friends were hosting a kink event in Minneapolis,
and feared that he may go and harass them since he had previously indicated that he knew I
was a performer. I warned them privately and sent his picture. He attended the event but did
not harm anyone.

I also had to contact the program advisors he mentioned and have some information removed
from the university website. This was particularly upsetting, because I had to disclose details I
was not quite ready to share about my personal life to people who ran my program. I told
them that I was queer, that Brock was stalking me, and that I had previously worked at a sex
shop and performed in burlesque. I knew that Brock knew some of these things and worried he
would send that information out of context in an effort to harm my reputation. This could have
directly affected my educational success and later my career. I wanted to be able to personally
contextualize these things to my supervisors in the event that they were targeted by him if
Brock kept his word.

I warned my friends that I was being threatened and they were not to engage with Brock if he
inquired about me or pursued them on dating sites. I had seen other women post his picture in
a group on Facebook, so I wanted to find out by word of mouth if there was anyone else he was
bothering in hopes of getting help. I wanted to see if they had any solutions in Minneapolis or if
a case had already been established, since Pennsylvania police were telling me that the fact
that we never met meant I could not take advantage of any protection laws in this state.

Around the same time, I met up with a person I had met through a dating site, who informed
me that when he looked me up, my name came up on a site called datingpsychos.com. I

Catherine Schaefer HRO Affidavit                                                              5

became extremely alarmed as this site listed my PhD program, full name, and location. I
forwarded all this information to the police.

Here are screenshots of the search results that turn up the datingpsychos.com page. Brock
appears to have edited it so it no longer has all the information, but it still shows my full name
and location in Google search results. These results come up before my university credentials
appear when "Catherine Schaefer State College" is searched. This is a reasonable way for
people to search for me, because Catherine Schaefer is a relatively common name.



Catherine Schaefer HRO Affidavit

6



06/29/2016  12:23    8148637002    PSYCHOLOGY    PAGE    08/13

Catherine Schaefer HRO Affidavit    7





Catherine Schaefer HRO Affidavit                                    8



Catherine Schaefer HRO Affidavit                                    9



This is extremely distressing as I am a second year graduate student and just beginning to plan projects that require national collaboration. If someone is searching for me, this information above will come up previous to my academic information. I will be working with a vulnerable population that is already hard for researchers to access; if parents find this information it is less likely they will participate in my research, which has repercussions for my PhD and my career. With these examples of how Brock uses different sites to further harass me I am asking the court to order that he not be allowed to mention me on any websites or in any social media posts. Postings about me on sites like datingpsychos.com with results showing up before any of my academic career could negatively affect my research, my PhD, and thus my career. Brock seems to know where the legal line is drawn so that he cannot be easily held accountable for his intimidating behavior.

Given Brock's tenacity in contacting me, I anticipate that things will only get worse when I begin my job search in several years and am no longer able to precede my online reputation with personal relationships. Brock has also made efforts to ruin the reputations of other women who have rejected him. Their posts also specifically state their occupations and reasons of questionable veracity as to why they should not be engaged with professionally.

After a listing for Brock showed up on this site, he contacted me and threatened a law suit. I did not post anything, nor did I instruct anyone to contact me or act on my behalf. I want as little to do with Brock as possible. He first messaged me on Facebook, and when I did not respond, he sent the same message, slightly altered, on collarspace. I did nothing, but was

Page 15

Catherine Schaefer HRO Affidavit                                              10

informed later that day that his profile was taken down, which leads me to believe he
threatened whomever else he has been harassing as well.



Although I was confident that I had in no way engaged in any harassing behavior, I knew that
Brock had filed false claims against another woman who suffered his harassment after she
rejected him. I am on a limited stipend, and do not have the resources to fight any frivolous
cases he might bring to entertain himself.

To contextualize this request, the following is a detailed account of Brock's harassing behavior
over the past two and a half years:

To the best of my recollection, I first met Brock in January of 2014 on OKCupid, a dating
website. I say to the best of my recollection because I never actually met him, and I know that I
filed my first police report ten months into his ongoing harassment, which was November of
2014.

I had exchanged several messages with him that I no longer have. We agreed to meet in
person, and I gave him my phone number. After that, several very odd texts came in from
Brock- I don't specifically recall their content, but they were enough to make me decide that
meeting this person was not in my best interest. I told him so and I believe it was something
very succinct along the lines of "I am no longer interested. Do not contact me again." I
remember wanting to make that very clear. His response was frantic, begging me to consider
him and offering me anything he could think of, including $20,000. He told me he was crying
and I believe he even sent a picture of himself at that point. I told him to stop contacting me-
very clearly, in all caps.

In the months that followed I received texts and messages from other profiles on other sites,
including OKCupid and collarspace.com (formerly Collar Me), that seemed to be from Brock.

Page 16

Catherine Schaefer HRO Affidavit                                              11

Brock has a unique way of writing that would alert me that it was him, or he would call me Cat or Catherine, when I went by a different nickname in social and professional spheres. I told him over text that I was not interested and he was not to contact me again or I would call the police. He responded to those messages begging me to forgive him and telling me he was very depressed, but I didn't contact the police because I was afraid that he would find out and escalate his behavior. I was also concerned that his contact via internet sources was not considered illegal. I do not have these messages saved as they caused me significant distress to see in my inbox and I just wanted him out of my life.

I received a text message in November of 2014 that just said "hello." I was on my way out of town and thought it might be someone from the training I was planning, so I asked who it was. The person said we met at a show, and I explained that since I had someone harassing me, I'd prefer if they sent me a picture so I could recognize their face. Brock sent me his picture. I was terrified that he had come to one of my shows without me knowing it, and I told him in no uncertain terms that I would be contacting the police for his continued unwanted contact. I blocked this number on verizonwireless.com. I called Minneapolis 311 afterward and explained my scenario. The operator took my story and I was contacted by phone by Officer William Schultz (Case # 2014-992779). Officer Shultz and I decided to keep a log of this activity, but since it seemed to be sporadic text contact with no direct threats, I believed it would not be a case that had enough evidence for pressing charges. I didn't know that Minneapolis or St. Paul provided orders for protection for this kind of harassment, and believed that since I hadn't met him, I had no legal options for protection. I was mainly concerned about his ongoing obsession with contacting me and wanted a record in case he escalated. I began carrying his picture on my cell phone and showing it to bouncers when I would perform, and someone else recognized him and gave me his full name- Brock Fredin.

I continued to get messages from screennames similar to his on collarspace.com. On 12/5/14 I got "how are you" and on 12/13/14 I got "you're a huge bitch." I got another on Christmas of that year saying "how are you?" I also received texts from different numbers that would say "Hi Cat;" one on 12/14/14, one on 12/20/14, and one on 2/17/15. I replied to the 12/14 text saying "NOT INTERESTED." One text I received from the number 952-222-8094 said "Hi Cat" and when I asked who it was I got the reply, "Jenna, sexy bi female." I don't know anyone named Jenna. I have not knowingly responded to any other texts.

The texts continued throughout the year. On 5/7/15 and 5/10/15 I received "Hi Cat" from 612-564-0343. Previous to that, I got "good morning cat" on March 29th from 952-222-8094. On 8/12/15 and 8/22/15, I received additional "Hi Catherine" texts. I reported these to Officer Shultz, but I was told that since I had moved from Minneapolis, I should report them to local police. I believed that Brock did not know I had moved. Given that the texts were becoming more sporadic and I was no longer in the area, I felt safer and resigned myself to dealing with this harassment every few months. I was beginning graduate school and did not want him to take up any more of my energy.

Page 17

Catherine Schaefer HRO Affidavit                                                            12

The texts continued sporadically, always saying the same thing, during the fall. I don't
specifically recall how many or when because I deleted them, but I am more than willing to give
access to my text history. I did get one within the past few months that said "Hi Catherine" and
when I asked who it was, I was told "Rachel." I do not know any Rachels, other than one that
was already in my phone. I did not knowingly respond to other texts or any messages that
could have been from him under alternate profiles on social media.

Brock has consistently ignored my requests to be left alone, and knowingly circumvented any
options I have used for blocking him. Given this extended period of harassment and recent
defamation, I am requesting the court order Brock to have no further contact with me as I have
asked him several times over the years to do so and he continues to contact me using various
usernames, social media sites, and texting using different numbers. I am also requesting that
the courts order Brock that he is not allowed to write about me on websites or mention me on
social media as it is affecting my educational career. This can affect whether partners and
participants decide to participate in my research and affect my reputation within my PhD
program. Brock's defamation of me could have long term effects on my career and livelihood.
I have already spent several therapy sessions dating back to 2014 discussing Brock's presence in
my life with a professional. His messages and posts indicate a complete irrationality about any
connection with me. I fear that if Brock is allowed to continue this behavior, someone could
get seriously hurt, and that person might even be me. I simply want Brock to leave me alone as
I asked him to do over two and a half years ago.

Catherine Schaefer
6/29/16

# Exhibit E

 Neutral
As of: August 29, 2019 6:01 PM Z

# Miller v. Fredin

Court of Appeals of Minnesota

January 23, 2017, Filed

A16-0613

### Reporter

2017 Minn. App. Unpub. LEXIS 76 *; 2017 WL 280974

Grace Elizabeth Miller, petitioner, Respondent, vs. Brock Fredin, Appellant.

**Notice:** THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**Subsequent History:** Related proceeding at Fredin v. Middlecamp, 2018 U.S. Dist. LEXIS 64946 (D. Minn., Apr. 13, 2018)

Related proceeding at Fredin v. Clysdale, 2018 U.S. Dist. LEXIS 219049 (D. Minn., Dec. 20, 2018)

Decision reached on appeal by Miller v. Fredin, 2019 Minn. App. Unpub. LEXIS 682 (Minn. Ct. App., July 22, 2019)

**Prior History: [*1]** Ramsey County District Court File No. 62-HR-CV-16-46.

**Disposition:** Affirmed.

## Case Summary

### Overview

HOLDINGS: [1]–The record supported a finding that an ex-boyfriend's conduct was harassment under Minn. Stat. § 609.748, subd. 5(b)(3) because the trial court found that the ex-girlfriend communicated that she wanted no further contact by telling him so and by blocking his social media account and phone numbers and that the boyfriend's later emails and text messages from an unknown phone number were repeated unwanted contact.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > ... > Crimes Against Persons > Violation of Protection Orders > Application & Issuance

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

### *HN1*[⤓]  Abuse of Discretion

A district court may issue a harassment restraining order if it has reasonable grounds to believe that the respondent has engaged in harassment. Minn. Stat. § 609.748, subd. 5(b)(3) (2014). Harassment is defined in relevant part as repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another. Minn. Stat. § 609.748, subd. 1(a)(1) (2014). The appellate courts review the grant of a harassment restraining order for an abuse of discretion, and the appellate courts will reverse if the order is not supported by sufficient evidence. The appellate courts defer to the district court's credibility determinations, and the appellate courts will not set

2017 Minn. App. Unpub. LEXIS 76, *1

aside its fact-findings unless they are clearly erroneous.

> Criminal Law & Procedure > ... > Crimes Against Persons > Violation of Protection Orders > Application & Issuance

> Civil Procedure > Appeals > Reviewability of Lower Court Decisions

***HN2***[⬇] **Application & Issuance**

The controlling statute requires that the court find at the hearing that there are reasonable grounds to believe that the respondent has engaged in harassment. Minn. Stat. § 609.748, subd. 5(b)(3). The statute nowhere requires the district court to make any other findings before issuing a harassment restraining order.

**Counsel:** For Respondent: Karmen McQuitty, University of Minnesota Student Legal Service, Minneapolis, Minnesota.

For Appellant: Nathan M. Hansen, North St. Paul, Minnesota.

**Judges:** Considered and decided by Ross, Presiding Judge; Schellhas, Judge; and Jesson, Judge.

**Opinion by:** ROSS

## Opinion

### UNPUBLISHED OPINION

**ROSS**, Judge

Quoth the Raven, "Nevermore." The district court granted Grace Miller a harassment restraining order against Brock Fredin after Miller ended their romantic relationship. Fredin argues on appeal that his post-relationship internet posting was just a personal reflection akin to Edgar Allan Poe's poem about his lost beloved, Lenore—a kind of

communication that Fredin insists can never constitute harassment. He maintains that the district court failed to make a particularized finding of harassment and that Miller produced insufficient evidence to establish repeated incidents of harassment. We see no error in the district court's findings, and we are convinced from the record that, unlike Poe's yearning for Lenore, Fredin's repeated unwanted contact with Miller can support the district court's finding of harassment. We therefore affirm.

### FACTS

Grace Miller **[*2]** and Brock Fredin met online and dated for about a month. Miller ended their exclusive dating relationship near the end of October 2015, but they continued as friends. The relationship deteriorated as reflected in a series of Facebook and text-message conversations from early December 2015. Fredin's messages annoyed Miller and began to make her uncomfortable. On December 3, they had the following Facebook exchange:

> B.F. What are you thinking about?
> G.M. Sleep
> B.F. Thinking about me I bet...
> G.M. Nope. Goodnight.
> B.F. I am coming over

According to Miller, she turned off all the lights in her house and locked herself in her bedroom because she was unsure whether Fredin would visit. Fredin sent Miller a text message again the next evening saying he was "stopping over." Miller responded, "No, please don't. I don't want a visitor tonight."

As it became apparent that Miller wanted no relationship with Fredin, Fredin's messages became unsettling:

> G.M. how [a]bout we be friends. . . .
> B.F. Nope. We are dating. Yes, you're taking me to see your family.
> . . .
> G.M. I'm done talking to you tonight. . . .
> B.F. Be a good girl for me. Here's a hot photo of what you can't have.
>
> [webcam photo of Fredin]

2017 Minn. App. Unpub. LEXIS 76, *2

. . .

B.F. Too bad **[*3]** you aren't in this tonight on your knees thinking of me. ;)

[photo of woman in lingerie]

You should have nightly tasks.

G.M. Stop it.

B.F. You really should meditate nightly, get on your knees, and think of me. It's good for your mental health. Also you're not going on any more first dates.

. . .

B.F. Why are you opposed to these things?

G.M. because I don't want a relationship with you anymore. I told you[.]

B.F. You do and will though. You need it. . . .

. . .

B.F. You're a very boring person. You have zero interests or excitement in your life. I would never be your friend. However, I will go on occasional dates with you and you're taking me out for my birthday.

On December 8 and 9, Miller unequivocally expressed that she no longer wanted to see or hear from Fredin:

G.M. yeah, I can forgive you, but I'm not going out with you.

B.F. Please let's still go on the occasional date, Grace. I was just seeing if you were into alpha guys. It was a thought experiment. I want to do so much for you.

G.M. no! I agreed to do that and it didn't work. because you forbade me from seeing other guys and smashed your face into my mouth when I tried to pull away from kissing you and now you're going completely f--king **[*4]** psychotic when I break things off. why on earth would I want more of this?

. . .

G.M. Second, I didn't want to encourage your delusion that we're dating when we're not. Or start another multi-day begging session. I'm tired.

B.F. Oh my gosh! Come on. It was a thought experiment weekend. Thought we were erasing that. You are amazing, Grace.

We are going on the occasional date. I'd like if you took me out for my birthday.

G.M. F--k you and your cruel thought experiments. You've done this s--t before.

We are NOT going on the occasional date. I am done talking to you.

. . .

B.F. Sweetie, you said you liked alpha guys. I was just trying to see if that was true. Go easy on me. You know my true personality!

. . .

B.F. Where are you taking us for my birthday? I'd like if you reconsidered and just remembered it was a thought experiment. I'd really like this to be a date. I wish you'd call me on the phone. It would be much easier. Did you find another guy or something?

G.M. No means no or seriously I will never speak to you again. I'm sick of this. NO.

B.F. May I please ask why? I love you Grace!

G.M. I've been telling you why for four f--king days. I'm going to bed.

Miller blocked Fredin's Facebook account **[*5]** that night. But he sent her a text message the next day:

B.F. I am kind of depressed you're not taking me out on Saturday for my birthday. No one ever has. Can't you be nice and go easy on me?

G.M. I've been telling you no for four days. Don't contact me again.

B.F. I am really sorry. Please forgive me. I'm begging you. . . .

. . .

G.M. No. Do not contact me again. Enough is enough. This is out of hand. Trying to block this number. Stop.

Circumventing Miller's attempt to block Fredin's communication, Fredin sent another text message from a different phone number that same day, asking for forgiveness. Miller did not respond and blocked both numbers. The next morning she received a text message from an unknown number. It was Fredin. Miller reiterated that he should leave her alone. She warned that if he contacted her again, she would call the police.

Fredin emailed Miller anyway on January 3, 2016, and Miller responded, "No. I told you to leave me alone. . . . [T]his is stalking and harassment. I was serious when I said I would call the cops. If you contact me again, I will." Miller blocked Fredin's email address. But Fredin emailed her twice on January 24. He also circumvented the email block by **[*6]** sending Miller $50 through PayPal.com with the message, "Thank you for everything." Miller did not respond to the emails and rejected the PayPal payment with the message, "I don't want your money." Miller finally called the police, who suggested that she ask the district court for a harassment restraining order.

Miller filed for a harassment restraining order on January 28. The district court granted a temporary restraining order, and a deputy sheriff served Fredin with the order on February 2. Miller received a notification on February 9 that Fredin had viewed her Match.com profile. She saw that his public profile included a note that read, "To a lost love: Incredibly sorry Grace. Sorry for what happened. NEVER intended anything of that nature. . . ." Miller sent a message to Fredin demanding that he remove her name from his profile. Fredin responded by adding more details to the note. She sent him a message the next day demanding that he remove the post.

Miller and Fredin testified at the restraining order hearing on March 21. Miller explained that she was earnest when she told Fredin to stop contacting her, that his continued contact was unwanted and intrusive, and that his conduct **[*7]** exacerbated her depression and anxiety, caused her stress, and made her paranoid. The district court recognized that relationship endings often involve ambiguous communication, but it found that "Ms. Miller was clear she didn't want to have contact." The court found that Fredin continually contacted Miller using email, text messages, and telephone after Miller blocked his communication by Facebook and phone. It chose not to make any finding about the Match.com note. The district court issued the harassment restraining order against Fredin using a preprinted order form. It checked the requisite boxes and entered as "other" grounds for harassment,

"respondent made repeated, unwanted contact with petitioner by continuing to communicate with petitioner despite being asked to stop all contact, having the Facebook account blocked and two separate telephone numbers blocked."

Fredin appeals.

## DECISION

Fredin argues that the district court improperly issued the harassment restraining order. **HN1**[⬆️] A district court may issue a harassment restraining order if it has "reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (2014). "Harassment" is defined in relevant part as "repeated **[*8]** incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another." Minn. Stat. § 609.748, subd. 1(a)(1) (2014). We review the grant of a harassment restraining order for an abuse of discretion, and we will reverse if the order is not supported by sufficient evidence. *Kush v. Mathison*, 683 N.W.2d 841, 843-44 (Minn. App. 2004), *review denied* 2004 Minn. LEXIS 639 (Minn. Sept. 29, 2004). We defer to the district court's credibility determinations, and we will not set aside its fact-findings unless they are clearly erroneous. *Id.*

Fredin asserts that the district court failed to make a particularized finding of repeated incidents of harassment. **HN2**[⬆️]] The controlling statute requires that "the court find[] *at the hearing* that there are reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (emphasis added). The statute nowhere requires the district court to make any other findings before issuing a harassment restraining order. The district court found that Fredin engaged in repeated, unwanted contact. This meets the requirement of subdivision 5(b)(3). And Fredin offers no authority prohibiting the district court from using a preprinted order form to record **[*9]** its findings. The district court checked the requisite boxes and added

sufficient details to explain the basis for its order.

Fredin argues that Miller did not prove repeated incidents of harassment. The record proves him wrong. The district court found that Miller communicated to Fredin that she wanted no further contact with him in early December by telling him so and by blocking his Facebook account and phone numbers. The district court also found that Fredin's later emails in January and his text messages from a third, unknown phone number were repeated unwanted contact. The court heard Miller's testimony and received copies of the Facebook messages, text messages, and emails. Fredin admitted to emailing Miller and sending her money through PayPal on January 24. Even if the exchanges in early December were ambiguous, Miller clearly told Fredin not to contact her again on three occasions, and Fredin ignored Miller's urging to be left alone. Sufficient evidence also supports the district court's finding that Fredin's persistent, unwanted communication in the face of Miller's attempts to prevent the communication substantially affected Miller's safety and privacy.

Fredin ultimately **[*10]** argues that his single, so-called "open letter" on his Match.com profile cannot constitute harassment. He urges us to characterize his post instead as just his remorseful reflection about unrequited adoration, because, as he puts it, he was merely "*faute de mieux* . . . shar[ing] his feelings in a personal way, as if in a journal." He caps the argument by quoting substantially from the following lovesick stanza of Edgar Allan Poe's *The Raven*, to which he asks us to liken his Match.com post:

Ah, distinctly I remember it was in the bleak December

And each separate dying ember wrought its ghost upon the floor.

Eagerly I wished the morrow;—vainly I had sought to borrow

From my books surcease of sorrow—sorrow for the lost Lenore,

For the rare and radiant maiden whom the angels name Lenore:

Nameless here for evermore.

Fredin's attempt to analogize his internet post to Poe's celebrated poem ignores the fact that the district court expressly did not base its harassment finding on Fredin's post but rather on the fact that he pursued Miller even after she told him that his continued overtures were unwelcome, harassing, and stalking, and that she would call the police if he persisted. Relying on the poem therefore **[*11]** both oversells on sympathy and understates on conduct. And we offer—purely as dictum—that when one is characterized, rightly or wrongly, as a frighteningly obsessive ex-boyfriend eligible for a harassment restraining order, the typical strategy for a reversal does not include aligning oneself with an allegedly opium-inspired author whose obsession with his deceased lover and other macabre poetry and prose are most commonly narrated for their chilling effect.

**Affirmed**.

---

**End of Document**

Exhibit F

Pagination
*      BL

Majority Opinion >

Minnesota District Court, Hennepin County, Fourth Judicial District

BARBARA ROLFSHUS v. TIME, INC.

No. 756161

June 14, 1979

Invasion of privacy action against magazine. Upon defendant's motion for summary judgment.

Granted.

Scott Bader, Minneapolis, Minn., for plaintiff.

John Borger, Minneapolis, Minn., for defendant.

Amdahl, J.:

## Full Text of Opinion

The plaintiff herein has commenced this action for invasion of privacy as a result of a news article and photograph published by the defendant in its April 5, 1976, issue. The defendant has moved the Court for an Order granting it summary judgment or judgment on the pleadings on the grounds that the action is barred by the statute of limitations. In addition, the defendant argues that Minnesota has never recognized a cause of action for invasion of privacy, and more particularly herein, there was no invasion of privacy on the part of the defendant.

In the April 5, 1976, issue of *Time*, an article entitled "Mason City: A Porn-Fed Town" appeared as a related story to the cover story, "The Porno Plague." The story dealing with Mason City discussed the arrival of sexually explicit entertainment in Mason City and included a photograph of the plaintiff, identifying her as a nude dancer. The plaintiff has alleged that as a result of the publication of the photograph in question, she has been subjected to public contempt, ridicule and has suffered an invasion of her privacy.

When considering a motion of this nature, all fact inferences must be drawn in favor of the nonmoving party. Northern States Power Co. v. Franklin, 265 Minn. 391 , 122 N.W. 2d 26 (1963). While the plaintiff has not explicitly included the terms "libel" or "defamation" in her Complaint, her characterization of her cause of action reflects one for defamation. The Complaint alleges that the plaintiff was subjected to public contempt, ridicule, loss of dignity and self-respect among family and friends. This is essentially an allegation of libel which is actionable for injury to one's reputation, thereby exposing him to "... public hatred, contempt, or ridicule ..." 11A Dunnell's Digest, Libel and Slander §2.02, p. 28. The plaintiff's failure to label her cause of action as one for libel does not take it outside of the bounds of such a cause of action.


© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 1

Rolfshus v. Time, Inc., No. 756161, 1979 BL 160, 5 Med. L. Rptr. 1443 (Minn. Dist. Ct. June 14, 1979), Court Opinion

Minn. Stat. §541.07(1) provides that all actions for libel must be commenced within two years. The facts of the instant case clearly demonstrates that the plaintiff has failed to comport with this statutory requirement. Therefore, based upon the foregoing discussion, the defendant is entitled to judgment as a matter of law.

However, the plaintiff argues that her action is one for invasion of privacy. Even if this Court were to disregard the statute of limitations as it relates to an action for libel, the plaintiff's cause of action must still fail. The plaintiff argues that she is entitled to the benefit and protection of Minn. Stat. §541.05(5) which provides a six-year statute of limitations,

> For criminal conversation, or for any other injury to the person or rights of another, not arising on contract, and not hereinafter enumerated;

The plaintiff argues that her cause of action for invasion of privacy falls within the six-year **[*2]** statute of limitations. The Court cannot agree with this argument. A cause of action for invasion of privacy is by its very nature similar to one for defamation. The problem presented is that both statutes contain language dealing with "personal injury" and "injury to the person or rights" as catchall phrases.

In Wild v. Rarig, 302 Minn. 419 , 234 N.W. 2d 775 (1975), the Minnesota Supreme Court had an opportunity to examine this issue. The Court held that "personal injury" as contained in Minn. Stat. §541.07(1) ,

> ... was not construed as "bodily injury" but was construed in an exact legal sense as the equivalent of a "personal wrong."

*Id* ., 234 N.W. 2d at 791 . The Court in *Wild* also held that the two-year statute applies to all actions for injuries to the person based on intentional torts or intentional publication of harmful material.

The Complaint in this matter alleges that the defendant knew or should have known not to publish the photograph and caption and that the defendant acted willfully, maliciously and in reckless disregard of the plaintiff's rights. All of these factors taken together provide strong support for placing the plaintiff's cause of action within the confines of the two-year statute of limitations.

Therefore, the plaintiff's cause of action must be dismissed for failure to comply with Minn. Stat. §541.07(1) . Having determined this issue adversely to the plaintiff, this Court need not consider whether or not the plaintiff has stated a claim upon which relief may be granted.

**Bloomberg Law**®

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
**// PAGE 2**

Rolfshus v. Time, Inc., No. 756161, 1979 BL 160, 5 Med. L. Rptr. 1443 (Minn. Dist. Ct. June 14, 1979), Court Opinion

# General Information

| | |
|---|---|
| **Judge(s)** | Amdahl |
| **Topic(s)** | Torts; Civil Procedure; Communications & Media; Privacy & Information Law |
| **Industries** | Magazines & Newspapers |
| **Parties** | BARBARA ROLFSHUS v. TIME, INC. |
| **Court** | Minnesota District Court |

Bloomberg Law®

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service